Good morning, Your Honors. May it please the Court, on behalf of appellants in this matter, we respectfully submit that the District Court committed a reversible error by dismissing this action with prejudice. On appeal are two categories of misstatements. We'll call the material impact statements, which were found in the risk disclosures, as well as we'll call the manageable statements slash the in line with expectation statements that were found in a number of statements made by defendants throughout the class period. With respect to the risk disclosure statements, the Court only dismissed the action on lost causation grounds. Now, with respect to materiality, we submit that materiality can't be a materially false mislead statement. It can't be seriously contended here. By the time a company made a statement saying that this may become material or this will become material, clearly the impact of the IOS changes had already been material to Meta. By that stage, by June 2021, 85% of users had switched into the IOS privacy settings. There was a 40% decline in the signal match rate. The signal match rate is the single most important metric for advertisers. That is not just an impact, that is a serious impact, a devastating impact to the company. And so when you have a 40% change in signal match rate decline, that seriously limits the company's capacity, Meta's capacity to sell advertisements, to track advertisements, and ultimately to profit. Let me ask you this, counsel, because given the allegations here, I think you have a tough argument on appeal. There's been multiple rounds of amendment, and I think you're going to have trouble meeting the heightened pleading standards for securities case. So tell me what your best argument is on the, on either one, the in-line manageable statements or material impact statements. Because there was no question that the impact was going to be substantial, material, significant, whatever adjective you want to use, but the company acknowledged that. Your Honor, we don't think the company acknowledged it. The company said in their risk disclosures that if they are unable to mitigate these IOS, the IOS impact, it will become material. And they make a statement, and Defendant Werner makes a statement at the beginning of the class period or before the class period, saying this is going to be manageable. Clearly analysts, and with respect to the manageability, with respect to the risk disclosure statements, the material impact statements, the Court did not dismiss based upon falsity or scienter, dismiss solely based upon lost causation. So counsel, if I refer to these by the numbers that were used, like 1A, would you know what I'm referring to? Sure. Okay. So let's take a look at 1A. As I understand it, one of what was said in the, one of the quarterly reports, talk about Apple made changes to the products. These developments have limited our ability to target and measure the effectiveness of ads, et cetera, et cetera, et cetera. I mean, that doesn't seem to me to be saying, yeah, this is no problem. We've dealt with it. Well, there's one thing to say that there's no problem. There's one thing to acknowledge that there's an issue. It's another thing when the issue is a 40 percent decline in signal match rate, when revenues have already, net income as a result of these changes declines by 6.7 percent in the second quarter and 9.6 percent in the third quarter, and all advertisers have declined their advertisements as a result of these changes. And they said in statement 1B, our advertising revenue in the third quarter was negatively impacted. If we're unable to mitigate these developments, our targeting and measurement capabilities will be materially and adversely affected. Exactly. They will be materially and adversely affected. And implying that they have not been. Although they said in the first statement, our advertising revenue was negatively impacted. Not materially so, Your Honor. And analysts are scouring the So there are magic words? No, not magic words. Material is not a magic word, Your Honor. The SEC uses material in promulgating the very statute that we're bringing suit under. Material is actually the fundamental cornerstone of the securities regulations. So when someone says in one statement, this is having an impact, and then says in another statement, this may be material, that's meaningful. That's the basis of all the securities laws. And this impact isn't just, we're not just slicing the salami very thin here, Your Honor. We've got a scenario where this is a $10 billion impact on the company. So at which point did they not acknowledge that the impact would be material if they're unable to mitigate? At what point is that? What they say is, what they're not acknowledging is that it's already having a material impact upon the company. That's what they're not acknowledging. They're not acknowledging that there's a 40 percent decline in the signal match rate, that there's all advertisers have declined their revenue spend, and there's already a material impact of 9.6 percent in net income as a result of these changes, and this is becoming a $10 billion tsunami. And all analysts, when we're talking about the risk disclosure statements, the district court only dismissed upon lost causation. The first time the company ever quantified it, the impact upon these changes on the company was in the fourth quarter, on February 2nd, 2022. The first time they quantified it, they said it's a $10 billion impact. All analysts said, all analysts were taken as surprised. They put them in the penalty box. They put Meta in the penalty box saying they failed to manage investor expectations. They said what looked like to be manageable appears to be a very significant headwind. All analysts said that there was a failure to manage expectations. They had no inkling that this was a $10 billion impact. Is it your view that they should have quantified it in order for it not to have been misleading? It's our view. I'm sorry. They were quite clear that if they could not mitigate the iOS changes, targeting and measuring would be materially and adversely affected, and it would significantly impact Meta's future advertising revenue growth. So that was not a statement that the impact would be immaterial. They were very clear that they expected an adverse impact that would be material. What they didn't do there, perhaps, it seems to me you're arguing with the fact that they didn't quantify it, the $10 billion. They didn't say it was already having a material impact. That's the issue. They said that these changes are negatively impacting us. If we can't mitigate, it's going to be material. At the time they're making this statement, there's a duty, and I think Your Honor is making a point as well, there's a duty of full disclosure. When you're making vague statements like this may become material or this is something that's manageable and it's in line with their expectations, and you know about this huge decline in signal match rate, you know about a significant decline in net income, and you're seeing that 85% of users have changed into the iOS privacy switches, and you're seeing that there's a $10 billion impact, you better tell investors. You can't just say, well, it might become material. They're soft peddling it. They're saying, sure, the whole market knows it's there, and we're not denying that, but they were soft peddling this issue. They specifically made a statement when we talk about manageable, they say this is going to be manageable. Nobody thinks that $10 billion is manageable, and actually JP Morgan specifically pointed to the manageable statements and said, wow, this is $10 billion, you led us to think it's manageable. So when you're making statements that it's manageable, it might become material, which implies it's not material yet, and you've got a $10 billion headache. Well, that's why I go back to 9B and the pleading standard that's really required. You know, under Rule 8, I think your argument would be a little bit stronger, where you can say, well, $10 billion, that's an unexpected magnitude of loss, according to some observers and analysts, and so at some point in the past, when the changes happened, they must have anticipated or had information that the order of loss was going to be somewhere in the billions of dollars, and so that may have triggered some disclosure rules, but I don't think that's the specificity that's required under 9B. We think we meet the, you know, we have the duty of the specificity under 9B. Again, the Court did not rule on the risk disclosure statements on materiality. I think purposely, because I think the Court had an issue with, you know, dismissing on materiality, it only focused on loss causation. But I think that the district court might have thought that that was the easiest way to go, not perhaps. I don't take that as an indication that the Court thought that maybe misrepresentation would be established with these allegations. Well, I think fair enough, but I think it is an indication the district court did not think it was that easy to dismiss these claims upon falsity, because you have a statement that clearly implies that these issues are not material yet. You have to combine that with the statement, this is manageable. The company is clearly — the company is saying, well, everyone knows that this is an issue. We're not — we all understand this. These are big changes. Everyone knows that this is an issue, but the company is saying it's manageable. The company is implying directly it's not — it's not material yet. The company is also talking about their significant progress in mitigation, and yet they've got a $10 billion headache on their hands. That's — that's — that's huge impact. And so when you're making these statements, you have to give a full disclosure. And you should say, had this company said, well, 85 percent of these people had converted to the I.O.S. changes, had they said that the signal match rate is down 40 percent, I think we may not be here. But clearly, this was having a tsunami effect upon the company, and they're saying it's there, it's an issue, but it's not quite material yet. And that's — Your Honor, that is a securities law claim. And the question is, it's not here for plaintiffs to say, you know, we can imagine what the impact of these statements would be upon the market, what — how investors took these issues. But we have, at the end of the class period, you have analysts, not — not — not — you don't have plaintiffs here. You have analysts, serious, sophisticated analysts who says they're in the penalty box. They made these statements. They did nothing to warn us about these — about this is a potential $10 billion headwind. That is market reaction. And when we look upon materiality, and we look upon the — the disclosures made by a company, the best — the only litmus test is the market. And the market here judged — judged here on what happened. It's not even — even district court. The market here judged what the statements were made by — by — by Meta. They judged whether or not they were properly disclosing their issues. And they said, no, we had no idea that this was going to be an issue of this magnitude. Your Honor, I'll reserve four minutes for rebuttal and this is a — for a question on this. All right. Thank you, counsel. Thank you. Good morning, Your Honors. Susan Engel on behalf of the Meta appellees. Whether you look at this case through the lens of falsity, loss causation, or scienter, the district court's decision can be readily affirmed. I heard plaintiff's counsel say, Meta said it's not material yet. The district court faulted plaintiffs for distorting the words that actually came out of Meta's executive's mouths in the earnings calls and that Meta said in the risk factor disclosure. I want to start with the statements 1A and 1B, which are the risk factor that plaintiffs focused on. That risk factor disclosure is exactly the type of disclosure a company is supposed to disclose, that there already had been an impact. That's the right disclosure, not a fraudulent one. In cases like the Alphabet decision from this court, the court faulted Alphabet for disclosing only that something may happen in the future when, in fact, the event had already occurred. Meta here did exactly what the Ninth Circuit said in Alphabet the company should have done. Plaintiff's complaint that Meta didn't use an adverb materially when it disclosed the past impact, that makes no sense in the context of what plaintiff describes as a formal SEC filing. The only reason for Meta to disclose, and it was very specific in its disclosures, the only reason for Meta to say that Apple's iOS 14.5 changes had already had an impact on targeting and measuring, had already negatively impacted revenues, the only reason for that disclosure is precisely because it was material. The federal securities laws do not turn on a company's use of adverbs. But even if there were any ambiguity, I think the earnings calls are the relevant context for evaluating the falsity of the challenge statements and also whether anything new was disclosed in February on that fourth quarter earnings call that plaintiff's point to. You're talking about the $10 billion statement in February of 2022. So I think what counsel's argument boils down to is just the magnitude of the $10 billion loss, which drew negative comments from analysts and observers. And if I understand his argument correctly, that's kind of, that's a big number. That is a very big number. And it should have been, the prior disclosures should have been more specific in terms of the magnitude of the anticipated impact. Well, certainly there's not a duty to quantify. And I actually would say that the disclosures in statements 1A and 1B, which by the way, those disclosures remained exactly the same, even in the corrective Q4 filing. But what plaintiffs are really arguing is the materialization of a disclosed risk. What Meta said on that fourth quarter earnings call, and I think it's also helpful to look, this is at the excerpts of record in 239. What Meta said was, looking at our fourth quarter results, also looking at Google's fourth quarter results, Google is benefiting in areas where we're seeing softness. What does that mean? It appears to us that Google is getting a relative advantage. That's something new that it was seeing from the fourth quarter results. That doesn't tell you anything about Meta's ad technology in the second and third quarter. It speaks to advertisers' reactions to not getting the same level of data, not being able to evaluate the effectiveness of their ads. Some of that ad spend was moving to Google. And what did Meta say? It said, we think going forward, we're going to see increased headwinds. Not the same, but increased headwinds. We're projecting going forward that there will be for 2022 a $10 billion impact. That doesn't say anything about the past. But to be clear, no investor could have understood that in the past there had not already been a material impact. I think it's also worth looking, and we added some of these earnings call transcripts into the record here, supplemental excerpts of record at 608. That's the second quarter earnings call. And by the way, Meta held two earnings calls every quarter. Meta was transparent, was describing this is a big deal, what's happening. It's significant. We are having to rebuild our whole ad system, the way we deliver ads. Meta said we're losing the data signal on which our advertising revenues, which are the bulk of our revenues, we're losing the data on which our ad revenues depend. No one could have thought this was a minor inconvenience. Meta said, to be clear, we think this is manageable. But they didn't say it's a small problem, we can manage it. And the question was asked by an analyst, because Meta did describe at length the mitigation efforts it was taking to blunt the impact while it was totally rebuilding its ad system. An analyst said, you know, listening to you describe these mitigation efforts, are you suggesting that the impact is not material? That's at 608. David Wehner, the CFO, short and sweet answer, no. Susan Lee, the vice president of finance, followed up. Not at all, that's not what we're suggesting. No investor could have read the risk factor disclosure, seen Meta disclosing we've had a negative impact. Listen to the earnings calls where Meta said do not draw the inference that plaintiffs are asking and ask Judge Gonzales-Rogers to draw. It's simply not plausible. And I think this factors into the falsity discussion. It also factors into loss causation. What was new on that fourth quarter's earnings call? There was no new disclosure that, hey, ad tech, oh, we've just realized it's all messed up. Nothing like that. Nothing like that was new that came out. What was new was that this increased risk that Meta had fully warned about, fully discussed with analysts, answering questions, had materialized. Well, in February of 2022 when Mr. Wehner stated for the first time and quantified the $10 billion impact, that was preceded by one day the 26.3% drop in stock value. So I think I've heard you argue that quantification of the impact was not necessary, but it obviously had an impact on the market. Would you agree? I would agree that quantification going forward, that $10 billion projection, and note that's a round number. It's not some specific calculation. A projection going forward, surely the analyst reports reflect two things. One, hey, Meta's disclosing increased headwinds. This is a bigger, you know, impact for 2022. Those same analyst reports, including the J.P. Morgan one, and these are in the fifth volume of our supplemental excerpts of record, those analyst reports that said that Meta so far had been performing in line with expectations. Those statements were entirely true, but I'll note Meta never quantified going backwards, right? That's an exercise in precision and certainty that, you know, we don't ask companies to do. What Meta did do in the second, third, fourth quarters was disclose its accurate revenue results, but it didn't break down revenues, and a company doesn't need to do that, right? That's like asking a to express an opinion and put some sort of subjective quantification. That's inviting a lawsuit, right? It is one thing to project going forward, but when you've disclosed your accurate results every quarter, when you've warned investors there has already been an impact, you have done what the federal securities laws ask you to do. I heard counsel say there's an obligation for, did he say, full disclosure, complete disclosure? That's not true. The obligation under the securities fraud standards and the PSLRA and 9B set very exciting standards for what the plaintiff has to plead. The obligation is to not mislead. Do not leave out a fact that would make a statement misleading. When you have put the negative impact into your disclosures, when you have said on earnings calls, this is very disruptive, we've already had decelerating revenue growth, we would have been positive. Sheryl Sandberg said that in her opening remarks in the third quarter. We would have had positive revenue growth except for the IOS changes. That's huge. The impact was big, and that's what Meta said. I'll also just note for the fourth quarter, in those analyst reports, and the district court flags this too in a footnote of her decision, plaintiff's characterization of the reports simply is not accurate. Yes, the analyst report said Meta's disclosing increased headwinds, Meta's disclosing that it has seen Google with a relative advantage, that's why we're projecting going forward $10 billion. Those analyst reports also noted that users had dropped for the first time ever, and the analyst reports talk about, wow, Meta said several times, there's more competition with TikTok for users. Meta saw its Facebook daily users drop for the first time ever. Nothing in the analyst reports, nothing in that earnings call, ER239, suggests anything new that wasn't disclosed at length about the second and third quarters. Is there a conflict, counsel, between the statements, and I'm talking about four, I guess it would be more B, C, and D, the in-line statements between calls, investor calls saying, well, okay, this is a significant impact, but it's in line with our expectations, and then building up to February of 2022, a significant headwind in the order of $10 billion. Is there a conflict there that needs to be reconciled? Not at all, because again, the $10 billion is setting expectations going forward for 2022. What were investors' expectations for the second, third, and fourth quarter? In each earnings call, Meta provided an outlook, and in the outlook- Well, sure. I understand that it's a forward projection, but it's for year 2022, so there's a temporal proximity there between in line with our expectation, in line with our expectation, in line with our expectation, and then a few months later, significant headwind in the order of $10 billion of loss. Well, I think Meta, I think the word expectation, Susan Lee in one of the statements actually says, the impact has been in line with our expectations, and this is baked into our outlook. So Meta is telling investors what to expect, and it did not give numerical guidance for the second and third quarter precisely because of the uncertainty, but it did say we expect decelerating revenue growth, and Meta executives did disclose revenue growth has decelerated in big part because of the IOS changes, and when you get to the fourth quarter, if you look at the analyst reports, there's not a disjunct with expectations. The analyst reports say two things. One, the fourth quarter results were in line with expectations. Meta had given a numerical range for the fourth quarter, and it actually came in at the higher end of expectations. So the analyst reports note Meta performed at the higher end of expectations for the fourth quarter, and Meta is giving what was new, was Meta was changing its guidance, or Meta was, the street was surprised by the guidance for the first quarter, and Meta was setting expectations going forward. Analysts reacted to that. Analysts also reacted again, we think, to Meta's discussion of the competition with TikTok for Facebook's daily users. I do also just want to make a couple points on Sienter. The district court, we think, reached the, you know, her decision rests on the grounds that jump off the paper, so to speak. She also conducted a 90-minute hearing on the First Amendment complaint where she, you know, addressed many of plaintiffs' other arguments, but just on Sienter, I think this court's decision in the Snead case recognizes that where you don't have a flagrantly false statement, the Sienter bar, which is already high, is even higher. So what do we have here? We have only two speakers left in the case, given how plaintiffs have winnowed their claim, Wehner and Susan Lee. Wehner signed the 10 cues. Susan Lee and Wehner made some of the comments that are challenged from the earnings calls, but there's not a single suspicious stock sale. Meta was buying back its stock during 21. Certainly, that provides an opposite motive. Meta's not wanting to inflate the price it itself is paying, and at best, I think even in their briefing, plaintiff's argument is based on inferences. There's no direct lie. I would distinguish the America West case that plaintiffs rely on in their briefing, where there's a direct lie. We said the company said there's no maintenance issues. In fact, there were maintenance issues. Yes, no. And the executives had sold 100% of their stock. This is not a case of securities fraud, and the district court should be affirmed. Thank you, Your Honors. Thank you very much, Counsel. Your Honor, touching on a few points that my adversary has made. First of all, as far as the argument that the $10 billion number was only prospective and it wasn't saying anything as to the 2021, what counsel neglects to say and the court didn't address, and the court only, again, on these risk disclosure statements, only addressed loss causation. If this court wants the district court to address materiality in Sienter, I think that's for the district court to do. I think there's a reason why the court didn't do so. And so with respect to loss causation, the first time and the only time that a numeric quantification of the impact of these I.O.S. changes was made was on that February 2nd statement. And so that's the only time the market learns how large this is. Otherwise, they're hearing really, quite from meta. They're hearing manageable. They're hearing essentially not yet material. Then they may hear some statements. There's an impact. There's a lot of other they're hearing about also. They're hearing that there's going to be some type of mitigation efforts. There's really a panoply of statements, contradictory statements made by defendants as to what the impact of these I.O.S. changes were. And the bomb really falls on February 2nd. And really, I think it does. It is honed in really by that query by the analysts to Lee and Werner. Are you saying that this is not material? They come back and say, no, we haven't quantified it. But they didn't say, indeed, it has been material. It's not an expletorious statement. They clearly were trying to not say it was not material. But they didn't want to say it was material either. That's clear. They could have said, no, it's material. They could have made that statement. But they stopped short. Yet they have other statements before the class period. And they're in line with expectations statements saying, it's manageable. And then they have statements in the risk disclosure saying, it will become material, implying it's not material yet. And so you have a company making very carefully crafted statements to the market, essentially confusing the market as to what really the impact of the I.O.S. is. And then the bomb drops on February 2nd, where it was clarified this is a $10 billion hit. That $10 billion hit tells you that there was a 40% signal match rate decline. It tells you that all advertisers had declined their spend during the last two quarters of 2023. And it also tells you the net income impact was material in the second and third quarter by 9.6% in the third quarter and by 6.7% in the second quarter. There's only one quantification. Until then, you have a series of very vague statements by the company implying things either way. And then that's what you – and then when a company has a duty, when they make an impression to the market, there has to be a – they have to speak fully and truthfully. If they decide to speak, they don't have to speak. They didn't have to say, it will become material. They didn't have to make that statement. They didn't have to make the statement at the beginning of the class period that it's manageable. But they spoke. And once they spoke, they had to give the full picture, not because plaintiffs said so, not because what defendants say, because the market said so. Because the market is the only real judge in these cases as to whether or not a disclosure was – whether expectations were proper and whether a proper disclosure was made. And the market made its decision on February 2nd when it said, we were – this was much bigger than expected. This is a big contrast between manageable and $10 billion, and they should be put in the penalty box for failures to manage expectations. The market got the expectations. The market got a message from MEDA, a very carefully crafted message. These were statements made by MEDA time and time again. Market comes to an expectation. That expectation was far different than the $10 billion tsunami that the company had finally disclosed. And we think the district court, if there's concerns about materiality in Sienta with respect to category statements, one, that the district court should rule upon those issues in the first instance as opposed to this Court. Thank you very much. Thank you very much, counsel, to both sides for your argument this morning. The matter is submitted and we'll issue a decision in due course.
judges: NGUYEN, BENNETT, Matsumoto